UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Charles Harris, | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | Case No. 04-1100 |
| | ) | |
| TNT Logistics North America, Inc., | ) | |
| Defendant | ) | |

**ORDER**

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the court is the defendant's motion for summary judgment (Doc. #13). For the following reasons, the motion is granted.

**UNDISPUTED FACTS**

The following recitation of fact is taken from the parties' statements of undisputed facts and the responses thereto, unless otherwise noted.

Plaintiff Charles E. Harris is an African-American. He was employed by TNT Logistics North America Inc. ("TNT") in Normal, Illinois. TNT provides logistical support in the delivery of parts and the repackaging of containers for Mitsubishi Manufacturing in North America. Until February of 2003, Harris was an hourly employee, primarily working second shift, in the Return Container Center ("RCC").

On February 5, 2003, plaintiff and defendant mediated an EEO charge of race discrimination. The parties entered into a settlement agreement resolving the charge, which provided that TNT would promote plaintiff to Shift Supervisor, Grade 11, by March

19, 2003 and that while plaintiff was a Grade 11 Shift Supervisor he would not be fired or demoted except for "good cause."

On March 28, 2003, plaintiff was promoted to a Grade 11 Shift Supervisor. On the date of his promotion, his immediate supervisor was Keith Schmidt, Operations Manager; above Schmidt was Contract Manager Jeffrey Murphy. Schmidt and Murphy had been plaintiff's supervisors at the time he had filed his initial EEO charge. Shortly after plaintiff's promotion, Schmidt was replaced by Tom Doyle, and Murphy was replaced by Merle Rocke. Rocke had total oversight of the entire Normal facility. Both Doyle and Rocke worked the day shift.

From that date until his employment was terminated on November 4, 2003, plaintiff served as Shift Supervisor for the second shift RCC. Second shift hourly workers normally worked from 5:00 p.m. until 1:15 a.m. As Shift Supervisor, plaintiff was a salaried employee. He did not punch a time clock, and he understood that it could be necessary to work more than 8 hour days or 40 hour weeks without overtime pay. He reported the time he worked to corporate headquarters in Jacksonville, Florida, via computer. Time was reported in half- or full-day increments. If less than a full day was worked, he had to indicate whether the time off was personal time off ("PTO") or unpaid time off.

TNT had a general Policy No. 1306, which was titled "Attendance Recording exempt (Salaried) Employees." This five-page Policy provided that "[m]isrepresentation of time and attendance by anyone will result in their termination." The Policy also prohibited anyone other than the salaried employee himself from logging and reporting the time worked. The Policy does not define what a "half-day" is.

In early August of 2003, a Caucasian employee, James Sipes, violated Policy 1306 by having someone else log in and report his time. He was fired for this violation.

On August 1, 2003, Rocke sent an email to all management personnel at the Normal facility, including Harris, regarding salaried employees' obligation to report their attendance truthfully. The email stated that "false information reported on an attendance record is cause for immediate termination."

On August 12, 2003, Harris received in interoffice memo from Rocke regarding a violation of Policy 1306. The memo reads as follows:

> This letter is a follow-up to our discussion yesterday ... when you admitted that you reported your attendance on Friday, August 8, 2003 as a full day worked. You stated that the only work you performed was attendance at our Contract 127 management meeting at 10:00am followed by an hour or so of "business-related discussions." You then also mentioned that you returned to the RCC in the evening to make sure the facility was secured for the weekend. When questioned, you stated that another member of management told you that historical practice at Contract 127 was to report a full day worked so long as at least six hours were actually worked. You admitted to only working "about five hours or so..." but evidence suggests you were probably in the facility four or fewer hours. As I expressed, I was surprised that you would treat your attendance reporting so casually - especially immediately following our focused discussion at our management meeting regarding Policy No. 1306. As you know, misrepresentation of time and attendance by any employee is a violation of TNT Policy No. 1306, Attendance Recording. The stated penalty is termination of employment.
>
> As we have discussed, your attendance for August 8, 2003 will be adjusted to reflect one half PTO day. In addition, you will serve a one-day suspension (without pay) on Friday, August 22, 2003.
>
> I know you realized the gravity of your mistake. The next occurrence will result in termination.

The memo concludes "I understand and accept this discipline: Charles Harris." It is then signed and dated by Harris, who admits that he understood that one more violation would result in termination of his employment.

On September 12, 2003, Harris' son was to be married. On July 9, 2003, Harris notified Doyle via email that he was planning to take PTO on September 11 and 12. Then on September 5, Harris sent another email to Doyle stating:

3

> I will only need Friday Sept. 12 off...I may be done by 6:00 pm or so, if so I'll be in late. Thursday Sept. 11 I'll just be a little late but I will be in. Aly will be able to get the shift started and I'll check in with her from time to time. I won't be more than ten minutes away....Thanks."

Doyle forwarded both of these emails to Rocke on September 8, commenting:

> It looks like I will need to start a little later on Thursday and Friday to make sure second shift is covered. Seems like someone is trying to make sure he gets paid for both days. I don't know but I would rather be here."

When Harris reported his time for the week, he reported September 11 as a full day.

On September 19, Doyle sent Harris an email, stating:

> Your Attendance Record for the week ending date 9/13/2003 has been disapproved. The following comments were entered: "... On Thursday 9/11/03, Charlie only worked ½ a day [sic] and claimed a whole day."

Harris viewed Doyle's disapproval of his attendance reporting as a stab in the back, and he concluded that the company was trying to get rid of him for some reason. Harris responded to Doyle with an email in which he asserted that he had worked 8 hours on September 11. He claimed he left for about 1 ½ hours, coming back to finish the shift and staying until 2:45 a.m. Harris sent Doyle a second email, dated September 21:

> Tom, I was under the impression that we had to work 8 hours a day, 5 days a week in order to claim a full weeks salary as long as there is work available or use PTO and I know from 12:00am 9/11/03 until 12:00 am on 9/12/03 I worked a total of 8 Hrs.20 mins., am I missing something somewhere? 8 hrs a day, not 8 hrs a shift, right? I know when we worked three shifts we only got in 38 hours or so some weeks and were paid the same. What's happening? This hours worked thing is really starting to wear on me. I though you said you had my back on these type of situations. After speaking with you on Sat., I do not wear a watch so if I mis-calculated the exact times I left and returned I apologize, but I still come up with the right at 7 hrs 40 mins. Remember the times I had to go to the dentist, there was never a problem. What did I do to have all these issues come against me now? I'm giving you the best I got and I would NEVER try to beat the Company out of anything and I know you have to do what you think is fair, but I always make sure my time is entered correctly and according to policy.

Doyle also reported this to Rocke. Rocke then solicited statements and documentation regarding the matter, obtaining written statements from Doyle and from the shift lead on Harris' shift, Alycia Edgecomb. Doyle reported in two separate written statements, both dated September 22. In the first, single-paragraph statement, Doyle

4

states that plaintiff came in to work just before 5:00 p.m., left again at 6:00 p.m. for a wedding rehearsal, and had not returned as of the time Doyle left work at 9:45 p.m. He also stated that Edgecomb told him that Charlie had returned about 10:00 p.m. and had left with the shift at 1:30. a.m.

The second statement adds a paragraph that Doyle had run into Harris at a social gathering on September 20. Doyle claims that Harris told him he had returned at 8:30 pm and stayed until 2:45 am. Doyle claims to have told Harris that it would have been impossible because Doyle had been there until 9:45. Harris then, according to Doyle, changed his story, stating that he had returned around 10:00 p.m. and left at 3:15 am. Doyle concluded that Harris was "not being honest about the amount of time he put in on the 11th.

Edgecomb reported in a 9/22 handwritten statement:

On September 11, 2003, Charlie Harris had to leave around 6:00 p.m. to go to his son's wedding rehearsal. He returned shortly after lunch. Our lunch hour is from 9:00 p.m. to 9:30 p.m. The whole crew left at 1:30 am.

At the bottom of Edgecomb's statement, Rocke added the following note, dated 9/24/03:

Alycia told both Tom Doyle and me that Charlie asked her on Friday, Sept. 19, 2003, that if she were asked regarding his absence from the RCC on Sept. 11h, would she please state that he was gone from the RCC "only a couple hours." She told him "no, you were gone more than 3 ½ hrs."

Alycia sent an email to Rock dated 9/25 as follows:

Per our conversation yesterday, Charlie Harris did leave early around 6pm or so. He came back around the end of lunch or so, which , at 9:30pm. The shift left at 1:30 or so. He had stated to me that if anyone asked say that he was only gone a couple of hours. That is the truth so I don't have to lie. Can my name be kept away from Charlie on this subject???

Harris viewed Edgecomb's statement to be another stab in the back, motivated by what he believed to be her desire for his job.

5

In a handwritten statement, undated, Harris wrote:

> On Thursday 9/1//03 I worked from 12:01 a.m. until 4:10 a.m. and returned to work around 4:15 p.m. and worked until around 6:20 p.m. I then left to attend my son's wedding rehearsal which lasted about 1 ½ hours. My lady said she dropped me off at around 9:30 or so back at work and picked me up at close to 3:15 a.m. or so. By my calculation I worked, if you figure from 12-12 as a day, 8 hr 45 mins. If figured differently I worked 7 or 8 hours so I saw no need to use PTO with that amount of hours worked in a day. I believe our policy is 8 hrs work in a 24 hr period or use PTO. I believe I met those guidelines which ever way the time is calculated.

Based on his investigation, Rocke concluded that Harris had falsified his time records for September 11. Despite the fact that this was a terminable offense (and was not the first one for Harris), Rocke chose instead to suspend Harris for 5 days, giving him a final chance. Rocke sent the following letter to plaintiff on October 1, 2003:

> This letter is to document the consequences of your attendance reporting following your absence from the RCC to attend a family event on Thursday, September 11, 2003. Evidence suggests that you were absent from the facility for at least 3 ½ hours - yet you reported your attendance as a full day of work. You subsequently indicated that you remained at the facility after everyone else had departed - at 1:37 a.m. You further indicated that you read email, checked to make sure the doors were locked, etc., and yet we both agreed that it would be difficult to understand how those activities would take longer than one additional hour. As I have expressed previously, I am surprised and disappointed that you would treat your attendance reporting so casually since you have PTO days available - and especially so soon following our focus discussions at several management meetings regarding Policy No. 1306. As you know, misrepresentation of time and attendance by an employee is a violation of TNT Policy No. 1306, attendance recording. The stated penalty is termination of employment.
>
> As we have discussed, the consequence of your actions could have been termination of your employment with TNT Logistics. In this particular instance, however, the decision has been made to assess a five-day suspension (without pay) from Sept. 24-26 and Sept. 29-30, 2003. I know you realize the gravity of your mistake. The next occurrence will result in termination.

At the bottom of Rocke's letter was the following statement: "I understand and accept this discipline" with a place for signature. Harris signed his name and dated the signature on 10/1/03. While Harris agrees that the letter "set out the gist of the ... conversation," he claims, that he asked whether signing the form would mean admitting what was said in the letter and that Rocke told him that it would not mean that.

During this same broad period of time, Rock spoke with plaintiff about rumors he had heard that Harris had been sleeping on the job or otherwise "disappearing somewhere."

6

Rocke obtained written (actually, emailed) statements from six employees to that effect. Alycia Edgecomb stated in an email to Rocke dated October 23, 2003, that on Friday, October 17, 2003, Harris had "disappeared" from 11:00 p.m. to about 11:30 and then again from shortly after 11:30 until 1:30 a.m. One of the office doors was locked and dark; at 1:30, that office was open and Harris was seen at the computer playing computer games. Edgecomb complained that, as shift leader, she should have been advised where he was. Her recollection of his disappearance on that date was confirmed by a written statement from an hourly worker on that shift who stated that he saw Harris "sleeping at the desk" at 10:30 p.m. and then that Harris could not be found until about 2:30 a.m. Another hourly worker wrote that "Charlie was gone for quite a while on Friday." Yet another worker noted that on October 17, he saw Harris sleeping at his desk in front of the computer for 20-25 minutes. Then, after lunch break, Harris was gone until 1:30 a.m.

Operations Manager, Ryan Feely, stated in an email that on October 23, he observed Harris at the RCC desk, apparently sleeping - his head was down, his eyes closed and his hands crossed."

Supervisor Stuart Barnes submitted a written statement on November 4, stating that on that date at 2:15 a.m., he observed Harris sitting in his chair with his head down. Barnes concluded that Harris was sleeping, since his he was motionless and the computer screen was dark. He watched Harris for a few minutes until Edgecomb approached him. From the way that Harris startled, Barnes concluded that Harris had in fact been sleeping. After Edgecomb left, Barnes continued watching, and Harris nodded off again for about 10 minutes, until he was wakened by a fork lift operator.

Harris disputes that he ever slept on the job (other than on breaks). He also claims that the hourly employees (all whites) who stated otherwise were getting even with him for what they perceived as Harris' mistreatment of them based on their race.

On November 4, 2003, when Harris arrived in the early evening for second shift, he was called into a meeting with human resource director Paula Balistreri and operations manager Robert Spangler[1]. Both had worked for TNT for two weeks or less. They gave Harris an Employee Disciplinary Report that terminated his employment; it read:

> Charlie was discovered sleeping on the job more than once. He was counseled verbally by contract manager Merle Rocke and told this was unacceptable behavior and could result in disciplinary action up to and including termination. Again on November 3, he was found sleeping on the job.

The Report had a place for employee comments. Harris wrote: "I feel that I am being treated unfairly - as to someone saying I was sleeping when I was not!!! No one can honestly say that I was asleep." He then signed the Report. During his deposition, Harris admitted that he played solitaire at the computer during work hours and that he would sleep at his desk on the floor of the RCC area during his breaks. He understood that while napping during break was acceptable, sleeping while on duty and not on break was grounds for termination.

Upon his termination, plaintiff filed this three count lawsuit. In Count I, plaintiff alleges that defendant breached the Settlement Agreement of March 2003 by terminating his employment without good cause. In Count II, the complaint claims that the discharge was motivated by plaintiff's race, and in Count III, that the discharge was in retaliation for the earlier claims of discrimination. In his response to the summary judgment motion,

---

[1] Tom Doyle's employment was terminated by Rocke in October of 2003 for misconduct unrelated to the events out of which the instant litigation arose.

plaintiff voluntarily withdrew his claim of racial discrimination, electing to proceed only on the other two claims.

## SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, the court should grant summary judgment if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Jay v. Intermet Wagner Inc., 233 F.3d 1014, 1016 (7th Cir.2000).

On a motion for summary judgment, the moving parties must first identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, that the parties believe demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving parties have met the threshold burden of supporting the motion, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In determining whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to and draw all reasonable inferences in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Haefling v. United Parcel Serv., Inc., 169 F.3d 494, 497 (7th Cir.1999). The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. Piscione v. Ernst & Young, L.L.P., 171

F.3d 527, 532 (7th Cir.1999). The proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, e.g., Jordan v. Summers, 205 F.3d 337, 342 (7th Cir.2000).

Although intent and credibility are often critical issues in employment discrimination cases, there is no special version of Rule 56 that applies only to them. See, e.g., Alexander v. Wisconsin Dep't of Health and Family Serv., 263 F.3d 673, 681 (7th Cir.2001); Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir.1997). Summary judgment is not a substitute for a jury's determination about credibility. Ashton v. City of Indianapolis, 1562724, *1 -2 (S.D.Ind.,2003). In an employment discrimination case, as in any case, the court must carefully view the evidence in the record in the light reasonably most favorable to the non-moving party and determine whether there is a genuine issue of material fact. See, Haugerud v. Amery School Dist., 259 F.3d 678, 689 (7th Cir.2001) (same standard applies to any type of case).

## DISCUSSION

**COUNT I BREACH OF SETTLEMENT AGREEMENT**

This Court has jurisdiction over a private plaintiff's action to enforce a pre-determination settlement agreement or a conciliation agreement, such as the one at issue here. See, Ruedlinger v. Jarrett, 106 F.3d 212 (7th Cir. 1997).

Settlement agreements usually are viewed contracts governed by federal common law of contract interpretation. Funeral Financial Sys. v. U.S., 234 F.3d 1015, 1018 (7th Cir. 2000). As such, the court is to use an "objective standard of reasonableness", U.S. v. Rand Motors, 305 F.3d 770, 774 (7th Cir. 2002), interpreting the language of the

agreement "in an ordinary and popular sense as would a person of average intelligence and experience." Funeral Financial Systems, 234 F.3d at 1018. While these cases are not cases involving EEOC agreements, I fail to see a significant difference between the law that governs such agreements and the law that governs other settlement agreements. The objective reasonableness standard[2] therefore applies to evaluate the decision to terminate Harris' employment. The finder of fact must evaluate whether the employer's determination occurred fairly, honestly and in good faith. There is no de novo review of the accuracy of the facts on which the employer relies. Work place issue by their nature routinely involve information provided to the corporate decision maker by other employees. The issue for decision is the employer's state of mind in making the decision.

One preliminary matter needs discussion. Plaintiff argues that the court cannot consider the written statements of the employees because they constitute hearsay. The federal definition of hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." F.R.E.801(c). Here, the purpose of offering the statements in support of

---

[2]Plaintiff would have this court import into this holding the requirement that there have been a complete investigation, notice, and an opportunity to respond before applying the objective test. I reject that argument. The only case on which plaintiff relies is a California state case, which has no precedential effect in this court. Cotran v. Rollins Hudic Hall Intern., Inc., 948 P.2d 412 (Cal.1998). That case imported these three elements without any reliance on federal case law. Moreover, while the existence of one or more of these three facts would certainly bear on whether the employer's determination of good cause was objectively reasonable, I do not believe these are the only factors which should be considered. If the employer's subjective finding of good cause was objectively reasonable, the absence of any one of these three would not in and of itself change that conclusion. The Cotran court appears to acknowledge as such, discussing the common law requirement of "fair procedure" and declining to delineate the details of what that concept entails, advocating the "incremental, case-by-case" approach to such questions. Id. at 910.

summary judgment is not to prove that plaintiff did in fact misrepresent his time or sleep on the job, but rather to show what the defendant believed at the time it acted and the basis for that belief.  See, Luckie v. Ameritech Corp., 389 F.3d 708, 716 (7th Cir. 2004)(statements admissible because offered to show supervisor's state of mind at the time she was evaluating employee's performance); E.E.O.C. v. University of Chicago Hospitals, 276 F.3d 326,333 (7th Cir. 2002)(employee's statements about imminence of dismissal not hearsay because offered to show employee's state of mind); Bell v. E.P.A., 232 F.3d 546 (7th Cir. 2000)(memo prepared by decision maker regarding applicant's qualifications admissible to show state of mind of employer but not to show that qualifications were in fact better than other applicant's); Stewart v. Henderson, 207 F.3d 374 (7th Cir. 2000)(statement offered to show motivation for decision to promote admissible as state of mind exception to hearsay rule).   The six employee statements are therefore considered to evaluate and explain what information the employer had in making its decision.

  Defendant asserts in its motion that it did not breach the settlement agreement because it discharged the plaintiff for good cause. I agree.  Plaintiff would have the court determine good cause by viewing only the final report of sleeping on the job, in isolation from the previous disciplinary actions.  That would be a very skewed view of the totality of circumstances, and I decline to do so.  Rather, I find that the final report of sleeping on the job was the final straw in a series of disciplinary actions, actions that gave plaintiff several chances to bring his conduct up to the level required by the employer.  His failure to do so constituted good cause.   And despite plaintiff's efforts to argue to the contrary, the fact that TNT decided to give Harris another chance (rather than immediately discharging him)

after the first few incidents does not prevent TNT from considering those prior incidents in determining discipline at a later date. The fact was that Harris' work history contained discipline for at least one prior offence that written company policy dictated was terminable.

Even if the court were to view just the final event in a vacuum, I would conclude that termination was for cause. Sleeping on the job is good cause for termination as a matter of law. Reed v. AMAX Coal Co., 971 F.2d 1295 (7th Cir. 1992)(upholding discharge of employee for sleeping on the job). See also, Coates v. Johnson & Johnson, 756 F.2d 524, 553 (7th Cir. 1985); Perry v. Pierce Chemical Co., No. 00C50186, 2002 WL 992658, May 114, 2002 (N.D.Ill.); Ekanem v. Health and Hosp. Corp., 724 F.2d 563 (7th Cir. 1983).

Accordingly, I find that the settlement agreement was therefore not breached by the termination of plaintiff's employment, because his discharge was based on good cause. Defendant's motion for summary judgment as to Count I is allowed.

**COUNT III RETALIATION**

Under Title VII, unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination. Fine v. Ryan International Airlines, 305 F.3d 746, 751 (7th Cir.2002) (citing 42 U.S.C. § 2000e-3).

A plaintiff has two means of proving Title VII retaliation: the "direct method" and the "indirect method." Logan v. Kautex Textron N.A., 259 F.3d 635, 638-39 (7th Cir.2001) (citing Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir.1994). Under the direct method, there are two types of permissible evidence. First, there is direct evidence; i.e., evidence that, if believed by the trier of fact, would prove the fact in question without reliance on inference or presumption. Walker v. Glickman, 241 F.3d 884, 888 (7th

13

Cir.2001); Rogers v. City of Chicago, 320 F.3d 748, 753 -754 (7th Cir. 2003). Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir.2000). There is no such evidence in this case.

The second type of evidence permitted under the direct method is circumstantial evidence, that is, evidence that would allow a jury to infer intentional discrimination by the decisionmaker. Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 762 (7th Cir.2001); Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 396 (7th Cir.1997). A decisionmaker is the person "responsible for the contested decision." Chiaramonte, 129 F.3d at 396; Rogers, 320 F.3d at 754. "A plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 504 (7th Cir.2004)(citing Troupe v. May Dept./ Stores Co., 20 F.3d 734, 737 (7th Cir. 1994). The circumstantial evidence must point directly to a discriminatory reason for the employer's action. Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003). See also, Koszola v. Board of Educ. of City of Chicago, 385 F.3d 1104, 1109 (7th Cir.2004).

In this case, the only actual evidence plaintiff proffers as circumstantial evidence is timing: the disciplinary reports happened after resolution of his prior claim of discrimination. His denials of the underlying events do not create material questions of fact, since the only issue is whether the employer honestly believed the reasons for the discipline. It was reported to the decision maker that he had misreported his time and had been sleeping on the job, both legitimate reasons for discharge. Neither his denials nor timing creates a

question of fact as to the decision maker's honest belief that the incidents actually occurred. I find therefore that there is no direct evidence or circumstantial evidence in support of a direct method of proving retaliation.

The indirect method of proving retaliation was explained in Stone v. City of Indianapolis, 281 F.3d 640 (7th Cir.2002). Under Stone, a plaintiff must show that, after filing a complaint of discrimination, only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing her job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment.

This adaptation of the McDonnell Douglas burden shifting analysis to the retaliation context requires that the plaintiff first establish a prima facie case by showing that:(1) he engaged in statutorily protected activity; (2) he performed his job according to the employer's legitimate expectations; (3) despite satisfactory job performance, he suffered an adverse employment action; and (4) he, and not any otherwise similarly situated employee who did not complain, was subjected to an adverse employment action. Stone, 281 F.3d at 642; Haywood v. Lucent Technologies, Inc., 323 F.3d 524, 531 (7th Cir. 2003); Hilt-Dyson v. City of Chicago,, 282 F.3d 456, 466 (7th Cir.2002).

If the plaintiff establishes these elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse employment action. Id. Although the burden of production shifts to the defendant under this method, "the burden of persuasion rests at all times on the plaintiff." Klein v. Trustees of Indiana Univ., 766 F.2d

275, 280 (7th Cir.1985); Haywood, 323 F.3d at 531. Once the defendant presents a legitimate, non-invidious reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual. Id.

Plaintiff's arguments in support of an indirect case are hardly more than pro forma. In fact, the only evidence regarding differential treatment of similarly situated employees involves a white male supervisor who misrepresented his time and was immediately terminated for that offense. In other words, Harris was treated better, not worse, than was this comparable employee. There is no evidence offered with respect to other employees who were reportedly sleeping during the work day. Moreover, the reported misconduct certainly casts doubt on any argument that might be made as to meeting legitimate expectations.

I therefore conclude that plaintiff has failed to make out the elements of a prima facie case under the burden shifting, indirect method. And even assuming the existence of a prima facie case, there is no argument at all as to pretext. Pretext requires more than showing an error; it requires proof of deceit, dishonesty or lies. The evidence in this case, put in the light most favorable to plaintiff, shows no such motivation. At the very best, Rocke made a mistake in concluding that plaintiff had slept on the job. As the Seventh Circuit has noted, if the decision was honestly believed by the decision maker - in this case, Rocke - then it matters not one whit that the decision may have been ill considered or unreasonable. Clay v. Holy Cross Hospital, 253 F.3d 1000, 1007(7th Cir. 2001). There is no evidence that the decision was not honestly entered into by Rocke.

Because plaintiff has failed to show disputed issues of material fact under either the direct or the indirect method, the motion for summary judgment as to Count III is allowed.

**CONCLUSION**

For the reasons stated above, the motion for summary judgment is allowed as to Counts I and III, and Count II is dismissed by plaintiff's stipulation thereto. The Clerk is directed to enter final judgment in favor of defendant and against plaintiff. This case is terminated.

ENTER this 29th day of December 2005.

s / John A. Gorman

JOHN A. GORMAN

UNITED STATES MAGISTRATE JUDGE